23-MJ-8107-PGL
23-MJ-8108-PGL

## AFFIDAVIT OF BENJAMIN COTE IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Benjamin Cote, a Special Agent with Homeland Security Investigations, being duly sworn, depose and state as follows:

## INTRODUCTION

1.  I am a Special Agent with the New England office of the United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI") with over twenty years of law enforcement experience.  I have been an HSI Special Agent since 2020, and I am currently assigned to the New England Field Office.  Prior to this, I was employed by the United States Air Force Office of Special Investigations ("AFOSI"), the Federal Air Marshal Service where I was assigned to the Federal Bureau of Investigation, Joint Terrorism Task Force, and by the Rockport Police Department. I also served with the United States Army Military Police as a reservist beginning in 1999 through 2007.

2.  As a Special Agent with AFOSI, I received extensive training and experience in criminal investigations and counterintelligence operations.  I was assigned to investigate numerous incidents of sexual assault, incidents involving children and other general crime investigations. I successfully completed the Criminal Investigator Training Program, and HSI Special Agent Training and AFOSI Special Agent Training at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia and the Federal Air Marshal Academy located at FLETC, Artesia, New Mexico, and the Massachusetts Criminal Justice Training Council Full-time Police Academy.  I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

1

3.      As part of my duties, I am authorized to investigate violations of the laws of the United States, including criminal violations relating to child exploitation, child pornography, coercion and enticement, and transportation of minors, including but not limited to violations of 18 U.S.C. §§ 2422, 2423, 2251, and 2252A.  I have received training and have attended specialized training and workshops in the investigation of child exploitation offenses, including child pornography, and have had the opportunity to observe and review examples of child pornography as defined in 18 U.S.C. § 2256.

4.      I am currently participating in an investigation relating to violations of federal law by an Ashley Shakespeare ("SHAKESPEARE", YOB 1982), for the possession and distribution of child pornography, in violation of 18 U.S.C. § 2252A.

5.      This affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure to search the residence located at 60 Calumet Street, Revere, Massachusetts, ("the SUBJECT PREMISES"), and the person of SHAKESPEARE, as more fully described in Attachments A-1 and A-2, which are incorporated herein by reference.

6.      As described herein, there is probable cause to believe that the SUBJECT PREMISES contains contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2252A, which items are more specifically described in Attachment B, which is also incorporated herein by reference.

7.      The statements in this affidavit are based in part on information provided by other law enforcement officers and on my investigation of this matter. Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that contraband and

evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2252A (possession and distribution of child pornography) are presently located at the SUBJECT PREMISES and on the person of SHAKESPEARE.

**STATEMENT OF PROBABLE CAUSE**
**INFORMATION FROM HSI ALBANY**

8.  On or about October 28, 2022, the New York State Police ("NYSP") Computer Crimes Unit received information from the U.S. Attorney's Office, Northern District of New York, involving consent for a Telegram account takeover received from the subject of a proffer ("the DEFENDANT") in their district[1]. The DEFENDANT, with the advice of his counsel, signed an online assumption of consent form, authorizing law enforcement to assume the DEFENDANT's online presence for several social media applications, including Telegram.[2]

9.  NYSP Investigators utilized the Telegram username, ▮▮▮▮▮▮▮▮ to assume the online presence of the DEFENDANT on the Telegram application.  As NYSP Investigators reviewed chats in the DEFENDANT's Telegram account, they discovered a chat between ▮▮▮▮▮▮▮▮ and "Dbts InIOWA" (the "SUSPECT ACCOUNT").  "Dbts InIOWA" was observed to utilize the username "@DbtsIowa" and the phone number "563-316-0332". The conversation between the SUSPECT ACCOUNT and ▮▮▮▮▮▮▮▮ was timestamped in the Telegram application and occurred

---

[1] The identity of the defendant is known to investigators, and all information obtained for this affidavit was obtained during the proffer agreement between the Northern District of New York and the defendant's attorneys.

[2] Telegram is an instant messaging application, made popular due to its enhanced privacy and encryption features.  Telegram chats, including group chats, are end-to-end encrypted.  Telegram also provides video calling, voice over Internet Protocol (VoIP), file sharing and other features.  The company is registered as an LLC in Dubai.

on September 4, 2022, and included the exchange of a video depicting child pornography. The relevant portion of that conversation is detailed below:

**SUSPECT ACCOUNT:** "hey"

██████████████████ "Hey buddy what are you doing"

**SUSPECT ACCOUNT:** "strokin"

"u?"

██████████████████ "Was cuddling with baby girl but she is about to go to church"

**SUSPECT ACCOUNT:** *SUSPECT ACCOUNT appeared to transmit a video, with the contents inaccessible to Investigators.*

**SUSPECT ACCOUNT:** "WERE U CUDDLING YOUR COCK IN HER?"

██████████████████ "Damn that was hot"

"Ima go check out this perv room real quick"

10.    The SUSPECT ACCOUNT then sent ██████████████████ a video[3].   The video, approximately 25 minutes and 33 seconds in length, depicts an adult male and a

---

[3] I am aware that the "preferred practice" in the First Circuit is that a magistrate judge view images that agents believe constitute child pornography by virtue of their lascivious exhibition of a child's genitals. *United States v. Brunette*, 256 F.3d 14, 17-19 (1st Cir. 2001) (affiant's "legal conclusion parroting the statutory definition […] absent any descriptive support and without an independent review of the images" insufficient basis for determination of probable cause). Here, however, the descriptions offered "convey to the magistrate more than [my] mere opinion that the images constitute child pornography." *United States v. Burdulis*, 753 F.3d 255, 261 (1st Cir. 2014) (distinguishing *Brunette*). The children described herein are four to six years old – in all events, younger than eighteen. Furthermore, the descriptions of the files here are sufficiently specific as to the age of the alleged children as well as the nature of the sexual conduct pictured in the file, such that the Court need not view the file to find that it depicts child pornography. *See United States v. Syphers*, 426 F.3d 461, 467 (1st Cir. 2005) ("The best practice for an applicant seeking a warrant based on images of alleged child pornography is for an applicant to append the images *or provide a sufficiently specific description of the images* to enable the magistrate judge to determine independently whether they probably depict real children.") (emphasis added); *see also United States v. LaFortune*, 520 F.3d 50, 56 (1st Cir. 2008) (similarly emphasizing *Syphers* court's use of "or" in describing the *Brunette* "best practice"). Where I have included such a nonconclusory, sufficiently specific description, this Court need not view the imagery to find that it depicts child pornography. Nonetheless, the described imagery is available for review at the Court's request.

prepubescent female, who appears to be approximately 4-6 years of age. The adult male and the child appear to be in a bedroom and are visible on a bed. The video, which includes sound, begins with the adult male speaking a foreign language to the female child. The adult male is nude, except for a pair of black socks and a necklace. The child is nude from the waist down, wearing a gray shirt, and holding a toy bunny with both hands and in her mouth. While lying on his back, the adult male begins to insert his penis into the child's vagina, with the child on top of the adult male and the camera focus on the child's buttocks. Shortly afterwards, the adult male then turns the child around and begins continues to penetrate her vagina while the child is faced away from him. At approximately 15 minutes into the video, the adult male picks up the child and repositions her onto her hands and knees. The adult male then penetrates the child's vagina again. At approximately 16 minutes and 23 seconds into the video, the adult male hits the child on the buttocks with his hand. At approximately 17 minutes and 15 seconds, the adult male begins to insert his fingers into the vagina of the child, while speaking in a foreign language directly to the camera. The adult male then penetrates the child's vagina with his penis again, followed by placing his mouth on the child's genitals. Towards the end of the video, the adult male appears to ejaculate inside the child's vagina. The adult male then brings the camera closer to the child's vagina, to focus on what appears to be semen on her. Throughout the entirety of the video, the child is visibly distressed and can be heard whimpering and crying. The child also places her toy bunny in her mouth and clutches it in her hands in attempts to comfort herself.

11.     Following the transmission of that video, the conversation continued:

███████████████ : "It's saying message not found f" "Can you try

resending it"

5

**SUSPECT ACCOUNT:** *Sends the video as described above.*

████████████████ **:** "Tha KS buddy I'm having a rough night so this may

help"

**SUSPECT ACCOUNT:** "did it help?"

████████████████ **:** "Sure did what you up to"

**SUSPECT ACCOUNT:** "In a pvt perv zoom with vids wanna join?"[4]

### IDENTIFICATION OF THE SUSPECT USER

12.    On October 31, 2022, HSI Syracuse submitted a summons to Verizon Wireless requesting

subscriber information associated with phone number 563-316-0332.  Verizon responded

with information stating that the number did not resolve to Verizon Wireless, but to

TracFone.  Verizon was able to determine the following information was associated with

this number.

- Device: TracFone

- IMEI:  356199116813486

13.    On November 16, 2022, HSI Syracuse submitted a summons to TracFone for subscriber

information for the phone number 563-316-0332. TracFone responded with the following

account information:

- Brand: STRAIGHT TALK

- Account ID: ashsh710@gmail.com

- Customer ID: 1361817321

- Date of Birth: XX/XX/1982

---

[4] Based on my training and experience, I believe that this statement means that the user of the SUSPECT
ACCOUNT was in a private Zoom meeting with other adults interested in child exploitation, which
included the sharing of videos of child exploitation.

14.     On December 12, 2022, HSI Syracuse submitted a summons to Google requesting subscriber information for the Gmail Account, ashsh710@gmail.com. Google responded with the following account information:

- Name: Ashley S

- Given Name: Ashley

- Family Name: S

- Email: ashsh710@gmail.com

- Terms of Service IP: 173.162.217.229[5]

- Recovery Email: ashsh710@yahoo.com

- Recovery SMS: 1-857-217-4566

15.     HSI Syracuse and NYSP performed online open-source searches utilizing Google on email address ashsh710@gmail.com and phone number 857-217-4566, which is associated with an individual known as Ashley Michel SHAKESPEARE.

16.     HSI Syracuse Special Agents conducted queries of law enforcement databases for Ashley Michel SHAKESPEARE which revealed 60 Calumet Street, Revere, Massachusetts, 02151, as an associated residence for SHAKESPEARE. The lead information was then transmitted to HSI Boston for further investigation into SHAKESPEARE's location.

17.     In March 2023, HSI New England Special Agents conducted a query of the Criminal Justice Information Systems ("CJIS"), Massachusetts Registry of Motor Vehicles ("MA RMV") for records associated with SHAKESPEARE. Queries revealed an expired Massachusetts driver's license, number S10645151, in the name Ashley Michel

---

[5] Open-source research performed on the initiating IP Address identifies the registrant for the IP Address as Comcast and an approximate geolocation with Massachusetts.

SHAKESPEARE and with a date of birth of XX/XX/1982[6], with the SUBJECT PREMISES listed as the residential address. An image of SHAKESPEARE on file with the RMV was also located with driver's license records.

18.     In March 2023, I located and viewed a publicly visible Facebook account with profile address, "Ashley.shakespeare.7", and a username of "Ashley Shakespeare". I was able to compare the image obtained from the MA RMV with the images posted on this Facebook account, and determined the images appeared to depict the same individual. In numerous posts shared on this Facebook account, SHAKESPEARE described himself as having returned to Boston from Iowa[7] in December 2020. Also depicted on SHAKESPEARE's Facebook page were several photos with a location identified as the SUBJECT PREMISES dated in the past year. Additionally, SHAKESPEARE posted on this Facebook account in November 2022 that he worked at chocolatier Läderach, a retail store, in the Prudential Center in Boston, Massachusetts.

19.     On April 5, 2023, I met with U.S. Postal Inspection Service ("USPIS") Inspector Ryan Noonan ("Inspector Noonan") and United States Postal Service ("USPS") Letter Carrier Robert Goglia ("Goglia"). Goglia stated he has delivered mail to the SUBJECT PREMISES and has done so for roughly ten (10) years. Goglia was able to describe SHAKESPEARE and immediately identified him when presented with a recent photograph. Goglia stated his most recent sighting of SHAKESPEARE at the SUBJECT PREMISES was during the week prior, and finally stated that SHAKESPEARE receives both mail and packages to the SUBJECT PREMISES.

---

[6] SHAKESPEARE's date of birth on record with the MA RMV is the same as the date of birth provided by Tracfone for their subscriber in response to law enforcement's legal request.

[7] This also appears to be consistent with the username of the Suspect Account, "Dbts InIOWA".

20.     On April 5, 2023, at approximately 9:18 a.m., Inspector Noonan, working in an undercover capacity and dressed as a USPS Letter Carrier, conducted a mail delivery to the SUBJECT PREMISES.  I observed the delivery, with an unobstructed view of the front of the SUBJECT PREMISES, while Inspector Noonan delivered live U.S. Mail to the SUBJECT PREMISES.  The mail was addressed to Ashley SHAKESPEARE, 60 Calumet Street, Revere, Massachusetts 02151, and another piece of US Mail addressed to Mrs. Anna Marie George (who I know, through my investigation, to be SHAKESPEARE'S mother), 60 Calumet Street, Revere, Massachusetts 02151.

21.     Upon approach, Inspector Noonan observed two mailboxes affixed to the fence outside 60 – 62 Calumet Street, Revere, Massachusetts, bearing the names Stefanoff C. George ("S. GEORGE"), A. George ("A. GEORGE"), and Shakespeare[8] (MA RMV inquires as well as information provided by USPS identified SHAKESPEARE and A. GEORGE reside at 60 Calumet Street and S. GEORGE reside at 62 Calumet). As Inspector Noonan approached the four-step wooden front porch, he observed that the property appeared to be a 2-family home, with two front entry doors facing the street.  Inspector Noonan observed the door on the left had the numerals "60" affixed, and the door on the right to have the numerals "62" affixed, with each door appearing to be associated with each separate residential unit.  Inspector Noonan knocked, announced, "hello, post office" three times, and received no answer.

22.     On that date, I continued to observe the SUBJECT PREMISES until approximately 11:15 a.m., at which time I observed SHAKESPEARE exit from the front door of SUBJECT PREMISES, approach and retrieve the postal mail from the mailbox, and immediately re-

---

[8] SHAKESPEARE and Edward George III share the same date of birth and social security number; it is my belief that SHAKESPEARE legally changed his name from Edward George III to SHAKESPEARE.

enter the SUBJECT PREMISES.

## BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET

23.     I have had both training and experience in the investigation of computer-related crimes, including those involving child pornography.  Based on my training and experience, I know the following:

    a.  Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other.  Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

    b.  Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable, or via wireless connections such as "WiFi" or "Bluetooth."  Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone. These memory cards are often large enough to store thousands of high-resolution photographs or videos.

    c.  Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections. Electronic contact can be made to literally millions of computers around the world.  Child pornography can therefore be easily, inexpensively, and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer, smartphone, or other internet-capable device.

    d.  The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. Electronic storage media of various types -

including computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer - can store thousands of images or videos at very high resolution. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. Some media storage devices can easily be concealed and carried on an individual's person.  Smartphones are also often carried on an individual's person.

e.  The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f.  Individuals also use online resources to retrieve and store child pornography.  Some online services allow a user to set up an account with a remote computing service that may provide email services and/or electronic storage of computer files in any variety of formats.  A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone, or external media in most cases.

g.  A growing phenomenon related to smartphones and other mobile computing devices is the use of mobile applications, also referred to as "apps." Apps consist of software downloaded onto mobile devices that enable users to perform a variety of tasks – such as engaging in online chat, sharing digital files, reading a book, or playing a game – on a mobile device. Individuals commonly use such apps to receive, store, distribute, and advertise child pornography, to interact directly with other like-minded offenders or with potential minor victims, and to access cloud-

11

storage services where child pornography may be stored.

h.   As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (*i.e.*, by saving an email as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files) or unintentional.  Digital information, such as the traces of the path of an electronic communication, may also be automatically stored in many places (*e.g.*, temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

**CHARACTERISTICS COMMON TO CONSUMERS OF CHILD PORNOGRAPHY**

27.   Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who produce, advertise, transport, distribute, receive, possess, and/or access with intent to view child pornography (i.e., "consumers" of child pornography):

a.   Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b.   Such individuals may collect sexually explicit or suggestive materials in a variety of media, including in "hard copy" and electronic format. Individuals who have a sexual interest in children or images of children oftentimes use these materials for

their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.      Such individuals almost always possess and maintain their hard copies of child pornographic material in the privacy and security of their home or some other secure location.  Many individuals who have a sexual interest in children or images of children and who have hard copies of child pornographic material retain that material for many years.

d.      Likewise, such individuals often maintain their digital or electronic child pornography in a safe, secure, and private environment, such as a computer and surrounding area.  These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, or in cloud-based online storage, to enable the individual to view the child pornography images, which are valued highly. Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis, sometimes in an attempt to destroy evidence and evade law enforcement.  I know through my training and experience that this type of behavior is often seen in individuals who have some level of technical expertise, are aware of law enforcement efforts to investigate child pornography offenses, gain access to child pornography on anonymized dark web networks like Tor or encrypted mobile applications (which are sometimes perceived by offenders as being "safe" from law enforcement detection), or struggle with their addiction or attraction to child pornography.

e.     Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and other digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[9]

f.     Such individuals also may correspond with and/or meet others to share information and materials, often retain correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain contact information for individuals with whom they have been in contact and who share the same interests in child pornography.

g.     Such individuals prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

h.     I submit that even when individuals use a portable device (such as a mobile phone) to access the Internet and child pornography, it is more likely than not that evidence of this access will be found in his home, including on digital devices other than the portable device (for reasons including the frequency of "backing up" or "synching" mobile phones to computers or other digital devices).

28.   Based on the foregoing, I believe that SHAKESPEARE, who resides at the SUBJECT PREMISES, displays characteristics common to consumers of child pornography. As

---

[9] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, e.g., *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370-71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010)).

detailed herein, SHAKESPEARE possesses child pornography utilizing Telegram, account **"Dbts InIOWA**," which was registered to phone number 563-316-0332.

### SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

29.    As described above and in Attachment B, this application seeks permission to search for records that might be found at the SUBJECT PREMISES and on the person of SHAKESPEARE, in whatever form they are found. One form in which the records are likely to be found is data stored on a computer's hard drive or other storage media, including cellular phones. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

30.    Based on my training, experience, and information provided by other law enforcement officers, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers. Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, accessing the internet, and storing a range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence of communications and evidence that reveals or suggests who possessed or used the device.

31.    I submit that if a computer or storage medium is found in the place to be searched, there is probable cause to believe those records referenced above will be stored on that computer or storage medium, for at least the reasons that follow.

32.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto

a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.

33.     Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.  Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

34.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

35.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." An internet browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

36.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant,

but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe this forensic electronic evidence will be on any storage medium in the locations to be searched because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has

used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating, or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, computers typically contain information that logs: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the Internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information

18

within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

37.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

38.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

39.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

40.    I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal

offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

41. Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because of:

a. The volume of evidence containing storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

b. Technical requirements for analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and

software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap." Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

42.     The premises may contain computer equipment whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene. Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge. In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant. If the things described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

43.     The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B. If, however, the law enforcement agents cannot make a determination as to use or ownership regarding any

particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

44.   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

45.   This warrant authorizes a review of electronic storage media seized, electronically stored information, communications, other records, and information seized, copied, or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, HSI may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## **CONCLUSION**

46.   Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits, and instrumentalities of these offenses, more fully described in Attachment B, are located at the locations described in Attachment A. I respectfully request that this Court issue a search warrant for the locations described in Attachment A, authorizing the seizure and search of

the items described in Attachment B.

_Benjamin Cote /by Paul G. Levenson_

Special Agent Benjamin Cote
Homeland Security Investigations

Sworn and subscribed before me telephonically pursuant to Fed. R. Crim. P. 4.1 this 1st day of
MAY 2023.

HON. JUDGE PAUL G. LEVENSON
UNITED STATES MAGISTRATE JUDGE